UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

State of Michigan,

      Plaintiff,

v.

M22, LLC, a Michigan limited
Liability company,

      Defendant.

No. 16-1084
Lower Court No. 16-648-CZ

HON. GORDON J. QUIST

MAG. RAY KENT

**BRIEF IN OPPOSITION TO
MOTION TO DISMISS**

**ORAL ARGUMENT
REQUESTED**

Toni L. Harris (P63111)
Attorney for Plaintiff
Michigan Department of Attorney General
425 W. Ottawa St.
Lansing, MI 48913
(517) 373-7700
HarrisT19@michigan.gov

John Di Giacomo
Attorney for Defendant
Revision Legal, PLLC
109 E. Front St., Suite 309
Traverse City, MI 49684
(231) 714-0100
john@revisionlegal.com
eric@revisionlegal.com

**THE STATE OF MICHIGAN'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT IN LIEU OF AN ANSWER**

**ORAL ARGUMENT REQUESTED**

      The State of Michigan ("State"), by and through its attorneys, Bill Schuette,

Attorney General, and Toni L. Harris, Assistant Attorney General, and in

opposition to Defendant M22, LLC's Motion to Dismiss or, in the Alternative,

Motion for Summary Judgment in Lieu of an Answer, states as follows:

## INTRODUCTION

This matter relates to the State's diamond-design trunkline sign, e.g., , which the State has used on trunkline roads throughout Michigan for nearly 100 years.  Defendant put the State's sign on a t-shirt and now contends that it is entitled to exclusive trademark rights over the sign, despite the fact that such rights are expressly prohibited under federal and state law vis-à-vis the Manual on Uniform Traffic Control Devices ("MUTCD") promulgated by the Federal Highway Administration, and the MUTCD adopted and supplemented by the State to include the State's sign.  The State asks this Court to recognize that express law and hold that Defendant's purported trademark rights in the State's route sign are unlawful.

Defendant claims "no harm, no foul," asserting that it will not enforce its alleged trademark rights against the State for using the State's own sign on Michigan's trunkline roads.  But that argument ignores at least three fundamental problems with Defendant's position.  First, as discussed below, Defendant's trademark protection for the M22 sign is simply unlawful in the first place.

Second, Defendant has used its unlawful trademark rights to restrict other small businesses' legitimate use of the M22 sign *and even their use of other state route signs*.  Like Defendant, others have also used the State's sign to promote their businesses along a scenic Michigan trunkline, including the Boy Scouts and other small businesses that have used the State's sign with various route numbers, including M-22, M-25, M-26, M-28, M-37, and M-119.  But they were forced to stop or pay money to Defendant to continue using the State's sign after Defendant

claimed exclusive trademark rights in the sign and threatened to sue.  Because of Defendant's behavior, any business that uses *any* Michigan trunkline sign is at risk.

Third, Defendant's trademark of the M22 sign in violation of the federal and state MUTCDs threatens the State's eligibility for federal funding.  If Defendant's claimed trademark rights over the State's sign are permitted to stand, the State is at risk of finding itself in one or more of three scenarios:  (1) the State may have to remove the diamond-design sign, which it has used in its current form for more than four decades, from the MUTCD, which expressly prohibits trademark protection of route signs in the Manual or placed on federal aid projects; (2) if the sign is no longer compliant with the MUTCD because it is protected by a trademark, the State may be required to remove the sign from trunkline roads across the State, including signs placed on federal-aid projects; or (3) the State may risk losing federal funding because, as a registered trademark, the State route sign is no longer compliant with state and federal law.  In short, the State would be at risk of losing federal funds for using a sign that is not compliant with state and federal law, or alternatively, the State could be faced with having to adopt and implement a new sign design for every Michigan trunkline.  Of course, any new sign would be subject to the MUTCD and not protectable by a trademark – unless Defendant or others unlawfully claim trademark rights in the sign, at which point the State would again be required to design another new sign, and so on, and so on. The equities of declaratory relief weigh decidedly in the State's favor here when Defendant's claim is carried through to its logical and fateful end.

2

Moreover, contrary to Defendant's position, the plain language of the MUTCD, as well as the Federal Highway Administration's interpretation of the MUTCD, confirm that the Manual applies to private parties. If, as Defendant contends, it applied only to public agencies, then private entities could place non-compliant signs and other traffic control devices with impunity, which violates the stated purpose of the MUTCD. Defendant's position is untenable.

Importantly, the question in this case is *not* whether Defendant can sell apparel and souvenirs, whether Defendant can sell those items bearing the State's sign, or whether Defendant can use the State's sign as its moniker. Contrary to Defendant's representations to this Court, and to the public in an attempt to put political pressure on the State, the State does *not* take issue with or seek to enjoin Defendant's or anyone's lawful use of the State's sign. Rather, the question is whether Defendant can acquire *exclusive* trademark rights in the State's sign when such rights are prohibited under the MUTCD. The answer is unequivocally "no."

Thus, Defendant's Motion fails. Because the MUTCD has the force and effect of law, applies to Defendant, and expressly prohibits trademark protection for the State's sign, anyone can lawfully use the sign, and should be able to do so without fear of being sued or shaken down for money. And, Defendant's ability to lawfully use the sign as its retail name and on t-shirts, hats, and other souvenirs will not be impacted simply because Defendant does not have trademark rights in the Sign.

## FACTS

In 1973, the State adopted the MUTCD first promulgated by the FHWA in

3

1971, and included the State's sign design in its current form, e.g., , in a

supplement approved by the FHWA.  (Ex. 1, p. 104; Ex. 2.)  In 2003, the MUTCD,

which is incorporated by reference in 23 C.F.R. § 655.601(d), was revised to include

a Standard requiring that any traffic control device design contained in the MUTCD

or installed on a road constructed or maintained by federal funds "shall be

considered to be in the public domain" and "shall not be protected by a patent,

trademark, or copyright, except for the Interstate Shield and any other items owned

by FHWA."  (Ex. 3, I-1)   For decades before the 2003 MUTCD was effective, the

State's sign was installed as part of federal-aid projects spanning hundreds of miles

of trunkline roads across Michigan.  (Ex. 4, Wieferich Aff., ¶ 11.)  For example, from

1999 through 2003 federal dollars funded numerous federal-aid projects where the

State's sign was placed, including M-8, M-10, M-18, M-19, M-20, M-21, M-25, M-28,

M-30, M-34, M-36, M-37, M-39, M-43, M-44, M-45, M-46, M-47, M-49, M-50, M-53,

M-54, M-57, M-60, M-61, M-81, M-83, M-84 M-90, M-91, M-100, M-102, M-115, M-

117, M-138, M-142, M-154, M-156, and M-179, to name a few, at a cost of more than

$11,600,000 in federal funds.  (Ex. 4, Aff., ¶¶ 5-10, Attachment A.)

In 2005, pursuant to 23 C.F.R. 655.603 and Michigan law, the State adopted

the 2003 federal MUTCD, including the new Standard prohibiting trademark

protection, along with a FHWA-approved supplement that included the State's sign

– the same sign that has been included in every version of the MUTCD with FHWA

approval since it was promulgated by the FHWA.  (Ex. 5; Ex. 6; Ex. 7, p. 17.)  In

2009, the FHWA published another updated MUTCD having the same Standard

prohibiting trademark protection for any sign design in the MUTCD or installed on roads constructed or maintained by federal funds.  (Ex. 8, p. I-1.)  In 2011, the State adopted the new version with a supplement including the State's sign approved by the FHWA.  These MUTCDs remain in effect today.  (Ex. 9; Ex. 10.)

In August 29, 2006, Defendant applied to register a federal trademark on the State's diamond trunkline design -  - with "M22online.com" below the sign in "tiny" print, as described by the Trademark Examiner (Serial No. 78963038).  (Ex. 11.)  The mark was registered on December 4, 2007, claiming a first use in 2004, without any reference to or consideration of 2003 federal regulations prohibiting trademark protection for the sign (Registration No. 3348635).  (Ex. 12.)  In May 2010, Defendant filed a second application for registration of the State's sign -  - that the Trademark Examining Attorney determined was used in "exactly the way the Michigan Department of Transportation uses 'M22' in its road signs for this highway" (Serial No. 85041051).  (Ex. 13.)   Defendant did not dispute the Examiner's finding, but rather made a new claim of acquired distinctiveness.  The mark was registered on July 12, 2011, again without reference to or consideration of the applicable 2009 federal regulations (Registration No. 3992159).  (Ex. 14.)

In December 2013, the State filed a cancellation proceeding with the United States Patent and Trademark Office ("USPTO"), Trademark Trial and Appeal Board ("Board") seeking cancellation of the above-mentioned trademark registrations based on, *inter alia*, unlawful use in commerce of the State's sign.  (Ex. 15, 2nd Amended Complaint.)  The Board denied the parties' summary judgment

motions on the State's claim, finding material issues pertaining to the legal effect of the MUTCD and its applicability to Defendant.  (Ex. 16.)  In turn, the State filed a Complaint for Declaratory Judgment in the state circuit court, which Defendant removed to this Court.  (Doc. 1.)  On September 14, 2016, the State filed a Motion to Decline Supplemental Jurisdiction, which remains pending.  (Doc. 4.)  On September 28, 2016, the Board suspended the cancellation proceeding pending final adjudication of the State's state and federal claims, which "involve a determination of, *inter alia*, whether [Defendant's] federal registrations are unlawful, whether [Defendant's] use of its registered marks is unlawful, and whether [Defendant] has common law trademark rights in its marks."  (Ex. 17, p. 3.)

## STANDARD OF REVIEW

A motion under Rule 12(b)(6) tests whether a complaint gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  *Reinhart Companies Employee Ben. Plan v. Vial*, 2009 WL 4639509, *4 (W.D. Mich. Dec. 2, 2009) (Quist, J.).  In deciding a Rule 12(b)(6) motion, the court cannot consider matters outside the pleadings.  *Poole v. Federal National Mortgage Assoc.*, 2016 WL 3085765, *2 (W.D. Mich. June 2, 2016) (Slip Copy).  In the context of declaratory relief, there must be " 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' "  *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

To the extent the Court considers matters outside the pleadings, a Rule

12(b)(6) motion is converted to a motion for summary judgment. *Tackett v. M&G Polymers*, *USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009). To succeed on a summary judgment motion, this Court must view the complaint in the light most favorable to the State and accept all well-pleaded factual allegations as true, although the Court need not accept bare assertions of legal conclusions. *Id*. at 488. Defendant has the burden to show the absence of a material fact and that it is entitled to judgment as a matter of law because "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Buchheit v. Lakeland Health Sys.*, 2016 WL 3922157 (W.D. Mich. July 21, 2016) (Quist J.) (Slip Op.).

## ARGUMENT

In the instant case, Defendant's motion to dismiss is baseless. The Complaint gives Defendant ample notice of the claims at issue, namely whether Defendant can protect the State's sign as a trademark. The State raised these same claims to the Board in a dispositive motion, which the Board denied on the theory that the federal and state law issues require final adjudication by a court of competent jurisdiction. For purposes of Defendant's summary judgment motion, the material facts as set forth above are not in dispute; only the application of law to those facts are at issue. The law prohibits trademark protection for the State's sign by any public or private entity and, therefore, Defendant's motion should be denied. Because the facts and applicable law leave no room for doubt that the State's sign cannot be protected as a trademark, this Court may enter summary judgment in favor of the State under Rule 56(f).

Furthermore, Defendant claims that the only issue before the Court is whether Defendant's conduct is prohibited under state law because the State's sign is not in the MUTCD.  (Doc. 5, pp. 20-21.)  In truth, in addition to its state law claim, the State also alleges that Defendant's use and registration of the State's sign as a trademark violates federal law, which prohibits trademark protection for signs in the MUTCD *and* signs installed on federal-aid projects.  Because the State's sign has been installed on roads throughout Michigan over several decades as part of federal-aid projects, federal law prohibits Defendant's use of the State's sign as a trademark.  Thus, Defendant's Motion should be denied, and declaratory judgment entered in favor of the State under Rule 56(f).[1]

## A. Defendant cannot protect the State's sign as a trademark.

The crux of this case is whether Defendant can acquire trademark rights over the State's sign under federal, state or common law, where such trademark protection is prohibited by state and federal law.  It cannot.

Under the Lanham Act, 15 U.S.C. 1051, "[t]he *owner* of a *trademark* used in commerce may request registration of its trademark on the principal register . . . ." 15 U.S.C. 1051(a)(1) (emphasis added).  Likewise, state and common law trademark rights arise from lawful use of a trademark in commerce.  M.C.L. §§ 429.31 *et seq*. Under "the 'lawful use' in commerce doctrine, use in commerce only creates trademark rights when the use is *lawful*."  *See Satinine Societa in Nome Collettivo*

---

[1] The State's Motion to Decline Supplemental Jurisdiction over the state law claim remains pending and, for the reasons explained in the State's Motion, Michigan courts are best suited to apply state law in this case of first impression.  (Doc. 4.)

*v. P.A.B. Produits*, 209 U.S.P.Q. 958 (TTAB 1981).  The Board will look to this Court's decision on the issue.  (Ex. 17.)

Here, Defendant is not the owner of the State's sign design, as it falsely asserted in each trademark application.  (Exs. 11 and 13.)  Rather, the State is the owner and has used the sign design in its present form for the last 40 years.  (Ex. 1.)  Furthermore, because the MUTCD explicitly prohibits trademark protection for the State's sign, it is not a "trademark" and cannot be protected as such.

**1.  The MUTCD has the force and effect of law.**

Title 23 of the United State Code is directed to highways.  23 U.S.C. §§ 101 *et seq*.  The Federal-Aid Highway Act (the Act), 23 U.S.C. §§ 101-170 (2011), "establishes a cooperative federal-state program for the development of safe, efficient and economical roads.  Under the Act, states which obtain federal funds are subject to close federal supervision to insure that the highways built meet safety standards acceptable to the United States Government."  *Center for Auto Safety v. Bowers*, 466 F. Supp. 829, 831 (D.D.C. 1979).

Under 23 U.S.C. § 315, Congress delegated to the Secretary of Transportation (Secretary) the authority to "prescribe and promulgate all needful rules and regulations for carrying out the provisions" of the Act.  *City of Cleveland v. Ohio*, 508 F.3d 827, 843 (6th Cir. 2007).  The Secretary does so through the Federal Highway Administration ("FHWA").  See *Center for Auto Safety*, *supra* at n. 2 (confirming that the Secretary "has delegated his duties pertaining to the Federal-Aid Highway Act to the . . . [FHWA].")

"The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).  Where, as here, "Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *U.S. v. Mead*, 533 U.S. 218, 227 (2001); see also *Chevron*, 467 U.S. at 844.  An agency's regulations that have been published in the Code of Federal Regulations, and its interpretative rules, have the force and effect of law. *Perez v. Mortgage Bankers Ass'n.*, 135 S. Ct. 1199, 1203-04 (2015) (explaining that regulations and interpretive rules issued under "notice-and-comment rulemaking" have the force and effect of law).

With Congress's explicit delegation to the Secretary, and thereby to FHWA, to promulgate rules and regulations to "promote the safe and efficient utilization of the highways," as set forth in 23 U.S.C. §§ 109(d) and 315, the FHWA issued regulations pertaining to "Traffic Control Devices on Federal-Aid and Other Streets and Highways."  23 C.F.R. §§ 655.601 *et seq*.  Under 23 C.F.R. § 655.601(d), "[t]he standards required in this section are incorporated by reference in this section . . . [,]" including the MUTCD.  The MUTCD is organized to differentiate between (i) mandatory or specifically prohibitive conduct regarding a traffic control

device, signified by "Standards," (ii) recommended but not mandatory conduct, referred to as "Guidelines," and (iii) permissive conduct, termed "Options." (Ex. 3, I-1-I-3; Ex. 8, p. 10.) The MUTCD also contains informational language found in "Support" statements. (Ex. 3, I-1-I-3; Ex. 8, p. 10.) Because MUTCD Standards are mandatory or prohibitive conduct and incorporated by reference in Title 23, Part 655, they have the force and effect of law and are given controlling weight unless they are "arbitrary or capricious in substance, or manifestly contrary to the statute." *U.S. v. Mead*, 533 U.S. at 227.

According to 23 C.F.R. § 655.603(a), the MUTCD approved by FHWA is the "National MUTCD" which "is the national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a)." In the MUTCD, the phrase "open to public travel" includes "toll roads and roads within shopping centers, airports, sports arenas, and other similar business or recreation facilities that are privately owned but where the public is allowed to travel without access restrictions." (Ex. 3, p. I-1; Ex. 8, p. I-1.) This plain and unambiguous language confirms that MUTCD Standards apply to private entities.

To qualify for federal funding and as required by Michigan law, the State adopted the MUTCD, and supplements thereto, with approval by FHWA Division Administrators. 23 C.F.R. § 655.603(b); MCL §§ 257.608-609. Any supplement "shall be in substantial conformance with the National MUTCD," meaning the "supplement shall conform as a minimum to the [S]tandard statements included in

the National MUTCD." 23 C.F.R. § 655.603(b). As explained by FHWA, while the State can be more prescriptive by changing a Guideline to a Standard in the MUTCD as adopted or supplemented, the State *cannot* omit a Standard or change a Standard to a Guideline or Option. (Ex. 18, p. 6, ¶ 2.)

Michigan law also requires the State to maintain traffic control devices in conformance with the MUTCD. MCL § 257.609. Although the MUTCD as adopted and supplemented by the State governs in most cases, where traffic control devices are installed on a federal-aid project, the Code of Federal Regulations requires all such devices to comply with the federal MUTCD. 23 C.F.R. 655.603(d)(2). Because the State's sign has been installed on trunkline roads using federal funds for decades, and long before Defendant put the sign on a t-shirt, the MUTCD applies and prohibits trademark protection for the sign. (Ex. 4, Aff., Att. A.)

### 2. The Supreme Court and other courts have confirmed that MUTCD Standards are mandatory and adherence is required.

In its Motion, Defendant claims that MUTCD Standards are merely guidelines and cannot be enforced. Its assertion is belied by every case Defendant cites. In *CXS Transp. Inc. v. Easterwood*, 507 U.S. 658 (1993), the Supreme Court stated unequivocally that *Standards* set out in the MUTCD are mandatory on all projects, and must be adhered to: "For all projects, [States] must employ devices that conform to *standards* set out in FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD or Manual)." *CXS Transp. Inc.*, 507 U.S. at 666 (emphasis added) (citing 23 C.F.R. § 655.603 (1992)).

Similarly, in *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011),

another case misconstrued by Defendant, the Ninth Circuit confirmed that "[i]n order to remain eligible for federal highway and highway safety program funds, a state must . . . adopt the federal MUTCD in conjunction with a state supplement." *Id*. at 910.  Although the facts in *Oliver* do not resemble those in the case at bar, the opinion is instructive here, but not for the reasons stated by Defendant.

In *Oliver*, the court found that (i) the MUTCD was issued pursuant to 23 U.S.C. § 109(d) and § 402(a), not the Rehabilitation Act; and (ii) the department of transportation did not revise the MUTCD to bring it into conformance with the Rehabilitation Act, but rather promulgated regulations to implement the Act's prohibition on discrimination.  *Id*. at 910.  Thus, a design feature inconsistent with the Manual was not a per se violation of the ADA.  *Id*. at 911.  *Oliver* is instructive in the instant case where the Lanham Act prohibits trademark protection for marks that do not meet the requirements for registration.  Like dozens of other statutes and regulations prohibiting trademark protection for various marks, in promulgating regulations prohibiting trademark protection for road sign designs in the MUTCD and signs installed on federal-aid projects, the FHWA promulgated a Standard prohibiting trademark protection to implement the Lanham Act's prohibition on marks that are not trademarks or are unlawfully used in commerce.

### 3.  Defendant's cited cases confirm that MUTCD "guidelines" are optional, while "Standards" are mandatory or prohibitive.

Other cases cited by Defendant discuss MUTCD *guidelines*, which are not Standards and, therefore, are not mandatory or prohibitive.  For example, in *Peruta v. Hartford*, 2012 WL 3656366 (D. Conn. Aug. 24, 2012), the plaintiff sought to

enjoin the city from operating and enforcing a Pay and Display Parking Meter System on grounds that the system, *inter alia*, failed to meet national uniform standards for traffic control devices, *as supplemented by state standards*, for giving notice of traffic laws and regulations. *Id.* at 1-2. The court held that the guidance portion of the MUTCD relied on by the plaintiff was, as explained in the MUTCD, only general guidance and, "therefore clear based on the express terms, structure, and context of the MUDCT [sic] that it poses nothing more than a form of guidance for states and local municipalities to follow in the design and placement of regulatory, including parking, signs." *Id.* at 14. The facts in *Peruta* have no resemblance to this case where Standards, rather than guidelines, are at issue.

Similarly, in *Wasserman v. New York*, 802 F. Supp. 849, 855 (E.D.N.Y. 1992) the court confirmed that "guidelines" in the MUTCD are not mandatory. In *Wasserman*, the sign at issue was posted farther away than the "suggested advance posting distances" set forth in the MUTCD. The court also distinguished the facts from *Peckham v. State*, 387 N.Y.S.2d 491, 492 (App. Div. 4th Dept 1976), where the state was found negligent because it did not post a sign in accordance with MUTCD *requirements*. *Wasserman*, 802 F. Supp. at 855.

And in *Albertson v. Fremont Co., Idaho*, 834 F. Supp. 1117 (D. Idaho 2011), another case that Defendant cites, the court confirmed that "the Idaho Supreme Court has held that a violation of a *mandatory* provision of the MUTCD may act as the basis for a claim of negligence per se." *Albertson* at 1137. However, MUTCD "guidelines" are not mandatory. *Id.* at 1136. The plaintiff's negligence claim failed

because application of the MUTCD on snowmobile trails, which are not "highways," is not mandatory. *Id.* at 1138.

Defendant's summary of another case, *Texas Department of Transportation v. Andrews*, 155 S.W.3d 351, 359-360 (Tx. App. 2004), as one in which the court found that MUTCD standards are discretionary rather than mandatory, is also wrong. In *Andrews*, the State of Texas adopted a Texas Manual with more stringent standards than the federal MUTCD, but the state statute authorizing implementation of the Texas Manual indicated that these higher standards were discretionary rather than mandatory. *Id.* at 359. The court confirmed that standards in the federal MUTCD are mandatory, while guidelines are discretionary. *Id.* at 359-60 (finding that "appellees presented no evidence showing that the roadway and extension do not conform to the standards set forth in the federal manual," and the provisions relied on were guidelines and, thus, not mandatory).

Defendant also misconstrued *Donaldson v. Department of Transportation*, 511 S.E.2d 210, 214 (Ga. App. 1999). In *Donaldson*, the court confirmed that "[t]hrough the Code of Federal Regulations, the MUTCD can be [sic] established applicable standard of care under proper facts." *Id.* at 213. However, the roadway at issue in the case was not a "Federal-aid highway so that the MUTCD would be applicable and have the force of law in this case." *Id.*

Clearly, the Supreme Court and other courts have left no room for doubt that MUTCD Standards are mandatory and have the force and effect of law. The Standard at issue here was issued in 2003 and prohibits trademark protection for

signs on federal-aid projects and signs in the MUTCD.  As of the effective date, the State's sign had been placed on dozens of federal-aid projects to which the new MUTCD Standard applied.  (Ex. 3, fed aid project charts; Ex. 4, Affidavit.)  In 2005, the State adopted the 2003 MUTCD with a supplement including the State's sign. Because the State's sign was in the MUTCD adopted by the State in 2005, and Michigan law requires that all signs in the MUTCD must comply, by the time Defendant filed its 2006 trademark application on the State's sign, claiming a first use in 2004, federal and state law prohibited trademark protection for the State's sign.  Both federal and state law also prohibited trademark protection for the State's sign by the time Defendant filed its second trademark application in 2010.

## B. The MUTCD is not preempted by the Lanham Act.

Defendant contends that the Lanham Act preempts the MUTCD Standard prohibiting trademark protection for the State's sign.  (Doc. 5.)  Yet, Defendant concedes that there are numerous statutes and regulations that prohibit trademark status for *dozens* of marks, none of which are preempted by the Lanham Act.

Under the Trademark Manual of Examining Procedure ("TMEP") § 1205, the USPTO affirmatively contemplates that "[v]arious federal statutes and regulations prohibit or restrict" trademark protection for certain marks, which are identified in a non-exhaustive list in TMEP Appendix C, such as Smokey the Bear (18 U.S.C. § 711), Woodsy Owl and his slogan "Give a Hoot, Don't Pollute" (18 U.S.C. § 711a), and dozens of others.  (Ex. 19.)  That the MUTCD is not *currently* listed in Appendix C is irrelevant, as the list is "nonexhaustive" and "other sections also exist . . .

16

which are not indexed under these terms."[2]

The Lanham Act itself also prohibits trademark protection for certain marks, including "the flag or coat of arms or other insignia of the United States, or of any State or municipality . . . ." 15 U.S.C. § 1052(b). These laws and regulations are exceptions to the Lanham Act, which "is something Congress can do[,]" as Congress has done by removing marks from the trademark protection. *The Last Best Beef, L.L.C. v. Dudas*, 506 F.3d 333, 339 (4th Cir. 2007) (finding that Congress has the power to amend the Lanham Act by prohibiting trademark protection via other laws and regulations). As the court explained in *Dudas*, to declare these laws and regulations prohibiting trademark protection " 'invalid' is to adopt a *per se* rule that Congress cannot amend or suspend prior legislation" through other laws and regulations. Accordingly, there is ample precedent for prohibiting trademark protection for various marks, and Defendant cannot demonstrate that the *MUTCD*'s prohibition should be preempted by the Lanham Act, while dozens of other similar statutes and regulations are not.

Referring to 36 C.F.R. § 261.22, Defendant admits that "it is clear that where . . . a regulatory agency through the Code of Federal Regulations, has intended to exclude certain subject matter from trademark registration, it has explicitly stated its intent to do so." (Doc. 5, p. 16.) The FHWA has done so in adopting a federal

---

[2] As explained in the TMEP, the MUTCD does not provide the basis for refusing or canceling registration; rather, the Board must consult the relevant statute or regulation "to determine the function of the designation and its appropriate use." TMEP § 1205.01. Because the State's sign is not eligible for trademark protection, Defendant's use of the sign cannot give rise to trademark rights.

regulation expressly prohibiting trademark protection for signs in the MUTCD or placed on federal-aid projects, and Michigan has done so through statutes requiring all signs to comply with the MUTCD.  In fact, contrary to Defendant's unsupported assertions that FHWA misunderstands trademark law in adopting a Standard expressly prohibiting trademark protection, FHWA clearly expressed its intent because it did not just dedicate the signs to the public domain, where such signs may be subject to trademark protection.  In 2003, the FHWA went one step further and expressly prohibited trademark protection through notice-and-comment rulemaking, where Defendant remained silent.  And, by its own admission, Defendant was not using the State's sign in 2003.

Like the dozens of statutes and regulations that are routinely upheld and enforced, the MUTCD's prohibition on trademark protection must also be enforced. Here, the MUTCD prohibits trademark protection for signs in the MUTCD or installed on roads constructed or maintained by federal funds.[3]  Because the MUTCD is not preempted by the Lanham Act, and the State has adopted the MUTCD with supplements approved by FHWA as part of its "contract" with FHWA to be eligible for federal funding, it is axiomatic that Michigan law requiring that all

---

[3] Strangely, Defendant places the blame for its inability to register the State's sign as a trademark on the State's "selfishness" in securing federal funding for its roads, claiming the State acted "through its own volition and in order to obtain federal road funding" by adopting the MUTCD and including in the Manual the State's sign design, with approval by FHWA, for more than forty (40) years. (Doc. 5, p. 17.) While Defendant contends that the State could have rejected federal funds and the MUTCD to allow trademark protection for the State's signs, such a ridiculous suggestion does not weigh in its favor because, under any scenario, Defendant does not own the State's sign and state and federal law mandate that it cannot be protected as a trademark.

signs comply with the MUTCD as adopted is not preempted.  See *Davis Next Friend LaShonda D. v. Monroe Co. Bd. Of Educ.*, 526 U.S. 629, 640 (1999).  Yet, as explained *supra*, that Defendant cannot trademark the State's sign does not prevent Defendant from lawfully using the sign.  Defendant merely cannot prevent others from doing the same.

> **1. The cases cited by Defendant demonstrate that courts and the Board regularly look to controlling statutes and regulations to determine whether marks have been lawfully used in commerce.**

The issue in this case is whether the MUTCD Standard at issue applies to Defendant and prohibits trademark protection for the State's sign with the force and effect of law.  The answer is a resounding "yes."  The cases Defendant cites are relevant here only insofar as they demonstrate that statutes and regulations prohibiting particular conduct must be considered when determining whether trademark protection is appropriate.  Otherwise, the cited cases are irrelevant.

For example, in *In re Stellar International, Inc.*, 159 U.S.P.Q. 48; 1968 WL 8159 (TTAB 1968), the applicant's shipment of cosmetics was misbranded with a label that included the applicant's mark but not an accurate statement of the contents as required by The Federal Food, Drug and Cosmetic Act.  *Id.* at *1.  The misbranded labels were used to establish use in commerce by the applicant.  *Id.* at *2.  The Board held that the question of whether the statement of contents *should* be required on the applicant's label was to be determined by the Secretary of Health, Education, and Welfare, rather than the USPTO.  *Id.*  The issue before the Board was whether the applicant's failure to include the contents on the label

19

rendered the shipment of goods "unlawful shipments" in interstate commerce from which no trademark rights can be derived and, therefore, barred registration of the application.  The Board denied registration because it could not accept "as a basis for registration a shipment in commerce which is unlawful under a statute specifically controlling the flow of such goods in commerce," and trademark rights did not accrue to properly form a basis for "use of a mark in commerce."  *Id.* at *3.  According to the Board, "a party may not enter commerce and seek registration unless and until he has fully complied with the particular Act of Congress which directly controls the commerce in such goods."  *Id.* at *5.  If a shipment of goods in commerce is proscribed by statute because it does not meet specific labeling requirements, the shipments under such nonconforming labels are " 'unlawful shipments' in commerce from which no trademark rights can accrue much less form the basis or foundation for a federally issued trademark registration."  *Id.*

Furthermore, the Board in *Stellar* confirmed that it cannot turn a blind eye to regulatory requirements that may have an effect on registration.  *Id.* at 3.  If the Patent Office determines that an applicant has not complied with the regulatory act, registration may be refused until compliance is made.  *Id.*  While the Patent Office is not required to police all regulatory statutes to ensure compliance therewith, if an inquiry can be made and information is forthcoming that renders the subject application void ab initio, it would be "illogical and incongruous" to expect the Patent Office to "conveniently forget about it and let the information 'slumber in the archives of the Patent Office.' "  *Id.*

Here, the MUTCD regulates traffic control devices used throughout the country on roadways where federal funds are used, and MUTCD Standards must be followed by the states and private parties, while the guidelines, support, and options are not obligatory.  Whether Defendant's sale or transportation of t-shirts and other souvenirs is regulated by an Act of Congress, and whether Defendant has complied with any such Act vis-à-vis labeling its products, has no bearing on this case.  Similarly, cases relating to unclean hands and unlawful commerce, as cited by Defendant, are irrelevant here, as the issue is not whether Defendant's shipment of goods bearing the State's sign violated a labeling statute.

Cases about whether an applicant misrepresented ingredients or whether an applicant's business was unlawful, as cited by Defendant, are also inapposite. *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q.2d 2045 (TTAB 1988) involves labeling issues and whether Kellogg complied with applicable statutes, rules and regulations pertaining to labeling.  *Satine Societa in Nome Collettivo v. P.A.B. Produits*, 209 U.S.P.Q. 958 (TTAB 1981) involves whether a non-compliant label used in shipping goods could acquire trademark rights.  In *Churchill Cellars, Inc. v. Graham*, 2012 WL 5493578 (TTAB Oct. 19, 2012), the Board held that the statutory requirement for label approval by the Department of Treasury Alcohol and Tobacco Tax and Trade Bureau was not met and, therefore, shipments of wine with the unapproved label did not constitute lawful shipments to constitute use for a trademark registration.  *General Mills v. Health Valley Foods*, 24 U.S.P.Q.2d 1270 (1992), relates to unlawful shipments wherein the Board stated that "[t]he decision

21

herein will require the Board to make a case by case determination of the importance or materiality of the labeling requirement which a party may have violated . . . ." In *In re Taylor*, 133 U.S.P.Q. 490 (TTAB 1962), specimens failed to show lawful use where the label failed to include information required under the Federal Food, Drug and Cosmetic Act. Similar cases on which Defendant relies are also irrelevant for the same reasons.

Defendant's assertions, and cases cited in support, misconstrue the matter at issue. Defendant is not the owner of the State's sign design and cannot, under federal and state law, use the sign design as a trademark.

### 2. The State's adoption of the MUTCD with a supplement to include the State's sign is not regulatory action and does not violate the interstate commerce clause or separation of powers.

For the same reasons that numerous statutes and regulations precluding trademark protection for various marks are not preempted by the Lanham Act, such laws and regulations do not violate the interstate commerce clause or separation of powers doctrine. The Supreme Court has held that Congress may establish and impose reasonable conditions on the states' receipt of federal funds, including compliance with federal statutory and administrative directives. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Indeed, such conditions have been deemed justified as a valid regulation under the commerce power and Section 5 of the 14th Amendment. *Id.* at 217. When states accept federal funds in return for complying with the federally imposed conditions, the acceptance is "in the nature of a contract[.]" *Davis*, 526 U.S. at 640. Here, the State receives federal highway

funding and, in return, must comply with the MUTCD on all federal-aid projects.

The FHWA determines whether the State's sign, as used on such projects and

included in the State's supplement, substantially complies with the MUTCD, and

has approved the sign as such for more than 40 years.  Thus, the State's inclusion of

the State's sign in the MUTCD is not administrative action.

### 3. Plain and unambiguous language in state and federal law shows that MUTCD Standards are not limited to the public sector.

The FHWA's interpretation of its regulations is controlling unless "plainly

erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461

(1997); see also *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 358-59

(1989).  Lest there be any doubt that the FHWA precluded trademark protection by

any public or private party for any sign design contained in the MUTCD, its own

interpretation of the provision, as explained in a final rule published in the Federal

Register on December 1, 2004, thus having the force and effect of law, demonstrates

that inclusion of a sign in the MUTCD renders it not protectable by a trademark by

any private or public party.  See 69 Fed. Reg. 69,815 (Dec. 1, 2004) (to be codified at

23 C.F.R. pt. 655), attached as Exhibit 20.  As explained in the Federal Register, the

American Pharmacists Association (APhA) suggested that its sign design

contemplated by the FHWA for use in the MUTCD should not be used because it

was protected by a trademark registered by the APhA in 1993 and, by incorporating

it into the Manual, "the FHWA would require that the symbol be released to the

public domain." (*Id.* at 69816, Ex. 20.)  Although the APhA was "willing to allow

the FHWA to use the symbol, that is different from placing it into the public

23

domain.  It is likely the APhA would want to retain its trademark so that the
symbol could be used for other purposes . . . such as letterhead, business signs, etc."
*Id*.  Thus, the FHWA did not include the sign.

Here, unlike the APhA, the State's sign has been installed on federal-aid
projects for decades, and the State included its sign in its MUTCD supplement,
which was approved by FHWA.  As such, the sign design is deemed not protectable
as a trademark by any individual or entity.  While the FHWA could have specified
in the MUTCD that the sign is not protectable by the public sector, it did not, and
reading such a limitation into the clear and unambiguous language of the Standard
would be improper.  See *Auer*, 519 U.S. at 461; see also *Christensen v. Harris
County*, 529 U.S. 576, 588 (2000).  Moreover, any other interpretation would be
nonsensical and prejudicial to the State, as allowing others to protect the State's
distinctive signs as a trademark would put the State in the position of defending its
right to use its own sign design.  Further, if the State's sign is removed from the
MUTCD, it would no longer be subject to MUTCD requirements, and others could
make unfettered use of the sign in a manner that jeopardizes traffic safety.

The MUTCD, as confirmed by the FHWA's interpretation, makes clear that
the prohibition on trademark protection is not limited in application to only the
states adopting it.  Indeed, in a Final Rule published in the Federal Register in
December 2006, the FHWA clarified that, pursuant to the terms of 23 C.F.R.
655.603, for the purpose of applicability, the MUTCD applies to privately owned
property and roads open to public travel, thereby confirming that the MUTCD is not

24

applicable solely to the states.  *See* 71 Fed. Reg. 75,111, 75,115 (December 14, 2006) (to be codified at 23 C.F.R. pt. 655), attached as Exhibit 21.  Furthermore, in the Final Rule adopted pertaining to the 2009 MUTCD, the FHWA further clarified that only pictographs *embedded* within a traffic control device are not subject to the provision prohibiting trademarks because the pictographs within the signs "are not in themselves considered traffic control devices."  *See* 74 Fed. Reg. 66,730, 66,733 (Dec. 16, 2009) (to be codified at 23 C.F.R. pt. 655), attached as Exhibit 22.

Moreover, Defendant's claim that the MUTCD applies only to public agencies is illogical.  If the MUTCD applied solely to public agencies, then private individuals and entities would have unencumbered rights to use and place signs in any form or fashion they desire.  MUTCD Standards have the force and effect of law and make clear that they apply to the use of traffic control devices used on public and private roads and trails open to public travel.

## CONCLUSION

Based on the foregoing, the State respectfully requests that the Court deny Defendant's motion because Defendant failed to meet its burden on all accounts. Moreover, the law as applied to the undisputed material facts warrants summary judgment in favor of the State under Rule 56(f).

Respectfully submitted,

BILL SCHUETTE
Attorney General

/s/Toni L. Harris
Toni L. Harris (P63111)

Dated: October 12, 2016          Attorneys for Plaintiff

25